**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| APEX FINANCIAL OPTIONS, LLC AND | § | |
| GOPHER FINANCIAL, LLC, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 19-0046-WCB-SRF |
| | § | |
| RYAN GILBERTSON, RRG FAMILY | § | |
| CAPITAL LLC, RYAN GILBERTSON | § | |
| FAMILY 2012 IRREVOCABLE TRUST, | § | |
| AND TOTAL DEPTH FOUNDATION, INC., | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

### BACKGROUND

This is an action for federal securities fraud, common law fraud under Delaware law, and breach of contract under Delaware law. The jurisdiction of this court is invoked under 28 U.S.C. § 1331 based on the federal securities fraud claim, and under 28 U.S.C. § 1367 based on the state law fraud and breach of contract claims. The court held a bench trial in this case from May 9, 2022, to May 12, 2022.

The plaintiffs, APEX Financial Options, LLC, ("APEX") and Gopher Financial, LLC, ("Gopher") are investment companies wholly owned by investor Peter Hajas. The two companies have sought damages from the defendants based on a transaction in which Mr. Hajas arranged for APEX and Gopher to purchase the defendants' equity interests in a sand mining company located in Wisconsin.

The company, Northern Industrial Sands ("NIS"), mines and sells northern white "frac sand," which is used in oil drilling operations that employ the fracking process to extract oil.

1

Defendant Ryan Gilbertson was the founder and chief executive officer of NIS.  The three other defendants are passive investment entities controlled by Mr. Gilbertson and his relatives. Defendant RRG Family Capital LLC ("RRG") is an investment company owned by Ryan Gilbertson, his father Weldon Gilbertson, and Ryan Gilbertson's minor son.  Defendant Ryan Gilbertson Family 2012 Irrevocable Trust ("the Trust") is a trust established by Ryan Gilbertson for his children.  Ryan Gilbertson's cousin, Chris Johnson, serves as Trust Protector for the Trust, and Weldon Gilbertson acts as trustee.   Defendant Total Depth Foundation, Inc., ("the Foundation") is a charitable foundation.  Weldon Gilbertson serves as president of the Foundation. The evidence showed that Ryan Gilbertson exercised substantial control over the assets and activities of each of those entities.

Ryan Gilbertson and the three other defendants owned interests in NIS, either directly or through an array of other related entities.  Those related entities included Northern Capital Group, LLC; Northern Capital Partners 1, LP; Northern Capital Partners 1, GP, LLC; NIS Investment Holding, LLC; and NI Sand Holding, LLC.  In October 2018, Mr. Gilbertson[1] and the other three defendants sold their interests in NIS to APEX and Gopher in the following manner:  APEX paid Mr. Gilbertson $275,000 for his equity interest in Northern Capital Group, LLC.  APEX paid the Trust $10 for its equity interest in Northern Capital Partners 1, GP.  Gopher paid Mr. Gilbertson $1,863,354 and RRG $4,136,646 for their respective equity interests in Northern Capital Partners 1, LP.  Gopher paid Mr. Gilbertson and the Trust $1,512,574.29 each, and paid the Foundation $1,815,089.14 for their respective equity interests in Class B units of NI Sand Holdings LLC, which were preferred shares having a mandatory redemption date of December 31, 2018.  The

---

[1] As used in this opinion, the name "Mr. Gilbertson" refers to Ryan Gilbertson.  Weldon Gilbertson and Brian Gilbertson, Ryan Gilbertson's cousin who was also the chief operating officer of NIS, are referred to by their full names.

total amount the plaintiffs paid to Mr. Gilbertson and the defendant entities for their equity interests in NIS and its related entities was $11,115,247.72.

The plaintiffs' breach of contract claim stems from Mr. Gilbertson's alleged breach of certain warranties and required disclosures set forth in the Equity Purchase Agreement ("EPA"), which was the instrument through which the defendants' equity interests in NIS were transferred to the plaintiffs. The plaintiffs' fraud claims—both the federal securities fraud claim and the state law fraud claim—are based on the plaintiffs' contention that Mr. Gilbertson knowingly provided false and misleading information regarding the value of NIS, principally by overstating the value of the company's inventory at the time of the sale by approximately $7 million and failing to disclose six contracts that imposed ongoing financial obligations that could burden the company after the sale. Mr. Gilbertson's actions, the plaintiffs allege, had the effect of overstating NIS's value at the time of the sale. As a consequence, the plaintiffs contend, Mr. Hajas purchased a company that he would not otherwise have purchased, and he suffered a loss of the full value of his investment. The plaintiffs seek an award of damages in the amount of the purchase price of $11,115,247.72 for the defendants' equity interests in NIS.

The defendants respond that they did not misrepresent the value of the company and that Mr. Hajas and his associates were given full access to NIS's books and records, from which they could, and did, form their own assessment of the company's value prior to the equity sale. Both parties seek an award of attorney's fees based on the fee-shifting provision that was included in the EPA.

## A.   Factual Background

Mr. Hajas has known Ryan Gilbertson since 2000, when Mr. Gilbertson began working for an investment services company co-owned by Mr. Hajas.  After Mr. Gilbertson left that firm, he and Mr. Hajas remained friendly and were in regular contact as social and business acquaintances.

In 2014, Mr. Gilbertson founded NIS to meet the demands of the oil production industry for northern white frac sand, which can be found in abundance in sub-surface deposits in certain areas of Wisconsin.  Mr. Gilbertson served as the president and chief executive officer of NIS until the closing of the EPA.

NIS's sand mine was located on an 800-acre property near Chetek, Wisconsin.  The site contained several facilities where distinct tasks necessary to producing the frac sand were performed.  First, land at the mine site was stripped to allow the sand to be extracted, after which the sand was removed from below the surface.  Next, the sand was crushed, screened, and processed to remove impurities, a process that took place at a "wet plant."  The sand was then transported to a "dry plant," where it was dried, sorted, and prepared for transport.  At the NIS facility, the dry plant was located about 10 miles from the wet plant, and the sand had to be trucked from the wet plant to the dry plant for processing.  The sand was then loaded onto rail cars at a rail yard adjacent to the dry plant.  The finished product would then be shipped by rail to a transload facility, where it would be loaded onto trucks for delivery to the customer at the drilling site.

In 2014, Mr. Hajas shared office space with Mr. Gilbertson and other officers of NIS. During that year, Mr. Hajas invested $4 million in NIS.  He later invested another $400,000 in the company.  From that time on, Mr. Hajas served as a member of an informal advisory group consisting of several of the investors in NIS.  In that capacity, Mr. Hajas provided Mr. Gilbertson with financial advice relating to NIS's affairs.

In June 2018, Mr. Gilbertson was convicted of securities fraud, conspiracy, and wire fraud in an unrelated matter.  During the same period, NIS was seeking to obtain additional working capital by refinancing its debt with the investment bank Dougherty Funding LLC ("Dougherty").  As a condition of the refinancing, Dougherty insisted that Mr. Gilbertson not be involved in the management of NIS going forward, and that he retain no more than a four percent equity interest in the company.

Mr. Hajas was also concerned that Mr. Gilbertson's conviction might adversely affect NIS.  Mr. Hajas therefore decided that steps should be taken to remove Mr. Gilbertson from his position of control over the company.  At the same time, Mr. Gilbertson was interested in generating cash to cover what he expected would be sizable monetary penalties assessed against him as a result of his criminal conviction.

On July 9, 2018, Mr. Hajas and another NIS investor met with Brian Gilbertson (Ryan Gilbertson's cousin and the chief operating officer of NIS) and Steve Swanson (a member of the NIS management team).  Mr. Hajas told them it was very likely that Ryan Gilbertson would be gone from the company after the re-financing was completed.  Although Ryan Gilbertson was initially resistant to being forced out of the company, Mr. Hajas did not believe Mr. Gilbertson was important to the success of the company.  Instead, he stated that his "money is on Brian [Gilbertson]."  Tr. 153:24–154:18.

On August 10, 2018, Ryan Gilbertson asked Mr. Hajas if they could meet to "talk about NIS."  Tr. 161:11–14.[2]  At their meeting three days later, Ryan Gilbertson explained that he was likely to face significant financial penalties at the sentencing proceeding in his criminal case and

---

[2]  As used in this opinion, citations to "Tr." refer to the official transcript of the bench trial in this case, which can be found at Dkt. No. 271.

that he needed to raise cash to prevent the government from seizing some of his irreplaceable assets, including his home.  Mr. Gilbertson inquired whether Mr. Hajas would be interested in purchasing the interests in NIS that he owned personally and through RRG.  After the meeting, Mr. Gilbertson provided Mr. Hajas with a spreadsheet reflecting the value of the company as determined under two different methods of valuation, including the "EBITDA multiple" methodology.[3]  Mr. Hajas expressed interest in purchasing Mr. Gilbertson's equity interests in NIS and began negotiating with Mr. Gilbertson on the price.  Meanwhile, Mr. Hajas and his "right-hand man," Shane Dore, began conducting a due diligence study of the company and the drilling sand market to make their own determination as to the company's value.[4]

Mr. Gilbertson's spreadsheet calculated the value of Mr. Gilbertson's share of the company at $9,098,589, which was close to Mr. Gilbertson's basis in the investment.  PX088-1.  Mr. Hajas used the same valuation methodology, but with somewhat different inputs.  Based on his inputs, Mr. Hajas derived a value of $6,493,905 for Mr. Gilbertson's equity interest in the company.[5]  DX183.  Mr. Hajas's calculation was based in part on an $8.7 million valuation of the inventory of sand owned by the company.  *Id.*

In early September 2018, after conducting significant due diligence directed to determining the value of NIS, Mr. Hajas offered $6.5 million for Mr. Gilbertson's equity interest in the

---

[3] EBITDA is a well-known financial reporting metric.  The acronym stands for "earnings before interest, tax, depreciation and amortization."

[4] The evidence at trial established that Mr. Dore served as APEX's chief financial officer and as an agent of Gopher.  He represented Mr. Hajas and the plaintiffs throughout the course of the NIS equity sale.  *See, e.g.*, Tr. 108:24–111:17.  Based on the evidence regarding Mr. Dore's role in the transaction, I find that negotiations with and disclosures to Mr. Dore, like negotiations with and disclosures to Mr. Hajas, constituted negotiations with and disclosures to the plaintiffs.

[5] One major difference between the two valuations was that Mr. Gilbertson's spreadsheet valued one of the company's accounts receivable at $1.3 million, while Mr. Hajas's spreadsheet valued that account receivable at zero.  *Compare* PX088-1 (cell B35), *with* DX183 (cell B35).

company.  Shortly before the closing on the equity sale, however, Mr. Hajas lowered his offer to $6 million.  Mr. Gilbertson ultimately agreed to that price.

In the course of the due diligence conducted by Mr. Hajas and Mr. Dore, NIS employees provided Mr. Hajas and Mr. Dore with company documents and materials as they requested them. As part of the due diligence investigation, Mr. Hajas and Mr. Dore had written correspondence and a number of in-person meetings and phone calls with Ryan Gilbertson, Brian Gilbertson, Steve Swanson, and the chief financial officer of NIS, Tim Brady.

The parties continued negotiating through September 2018 in anticipation of closing the sale in early October.  Between September and the ultimate closing in mid-October, an issue arose as to the value of the inventory of sand owned by NIS.

On October 1, 2018, Mr. Brady sent Mr. Dore a draft of the company's July and August financials.  PX126.  That draft valued the company's inventory as of August 31, 2018, at $9,015,027.  *Id.*

On October 9, 2018, Mr. Brady sent the final August 2018 financials to Mr. Gilbertson. Those financials listed an inventory value for NIS of $13,437,560 as of August 31, 2018, which represented an increase of almost $4.5 million in inventory from the draft financials for August. PX136-1.  That evening, Mr. Hajas sent a text message to Mr. Gilbertson inquiring about the company's financials for August and September.  PX212.011.  Mr. Gilbertson responded that he "brought in an outside accounting firm to compile everything independently" and that he would check with the accountants and send the financials to Mr. Hajas shortly.  PX212.012.  Referring to Mary Huhn, NIS's former in-house accountant who had recently left the company, Mr. Gilbertson added that when examining the August financials, "we found issues with Mary's methods—an inventory driven issue."  *Id.*

Later that evening, Mr. Gilbertson sent an email to Mr. Hajas and Mr. Dore with a copy of the version of the company's August 31 financials that Mr. Brady had sent to Mr. Gilbertson earlier that day.  PX136.  In the email message, Mr. Gilbertson attributed the approximately $4.5 million discrepancy between that version and the draft financials to an issue with the accounting methods used by Ms. Huhn.  *Id.*  According to Mr. Gilbertson, using Ms. Huhn's method of calculating inventory had resulted in the inventory values being "chronically understated" on the company's financial statements.  *Id.*  Mr. Gilbertson explained in that email that "[m]ore accurately," all production and freight costs "should go into their respective inventory pool and then be pulled out as Tons are invoiced as COGS [cost of goods sold].  In this manner inventory is based on capital spent, not estimates of what is where, then inventory levels can be cross-checked against COGS at different points along the way for accuracy as opposed to estimated inventory levels." *Id.; see also* Tr. 646:19–649:5, 650:14–653:5 (Ryan Gilbertson's testimony explaining the decision to change the method of calculating inventory after Ms. Huhn's retirement).

At around the same time, Mr. Gilbertson emailed Darren Kray at Carlson Advisors, NIS's outside accounting firm, and asked Mr. Kray:  "[C]an you confirm that [the financial statements] are solid also as an independent source?  It's critical that the financials be reliable for the current financing[.]" DX088.  Mr. Gilbertson testified that he sent that email because he "wanted Darren to go through every single transaction with a fine-tooth comb and make sure everything was . . . 100 percent accurate, beyond question." Tr. 649:14–19.  Later that evening, Mr. Kray responded to Mr. Gilbertson, stating that Matt Wills (an accountant with Carlson Advisors) and Megan Christenson (an accounting assistant who worked for NIS) had "reconciled the balance sheet accounts and reviewed the expense categories for August." DX088.  He added that "[w]e calculated the cost of goods sold for the eight month period ended August 31 based on our

8

discussion yesterday—we can send you the reconciliation of cost of goods sold tomorrow morning." *Id.*

On the morning of October 10, 2018, Mr. Kray sent another email to Mr. Gilbertson. That email included the NIS consolidated balance sheet as of August 31, 2018, which listed the same $13,437,560 as the value of the company's inventory as of August 31. PX139. Mr. Kray explained that the cost-of-goods-sold reconciliation "assumes that the sand sold has a cost of $19.02 per ton, as we discussed, and accounts for rail costs as calculated by Tim [Brady] based on the tons sold in basin [i.e., at the railheads near the drilling sites]." *Id.* Mr. Gilbertson forwarded Mr. Kray's email and the attached financials to Mr. Hajas and Mr. Dore later that day. *Id.*

After receiving the August financials, Mr. Dore contacted Brian Gilbertson and requested supporting information for the increase in the inventory value in the August financials. In response, Brian Gilbertson sent Mr. Dore a detailed inventory tracking sheet for the company covering the past two years. PX143-1. In his cover email, Brian Gilbertson promised to try to provide a "snapshot" of the value of the company's inventory as of August 31 by the end of the day. PX143.

Brian Gilbertson then contacted Ms. Christenson and asked her to prove a close estimation of the "in-basin and en-route inventory" as of August 31. PX144. She responded by stating that the company's records showed that as of August 31, a total of 17,250 tons of sand were en route and 43,637 tons of sand were located at railheads in Oklahoma, Texas, and New Mexico, ready to be delivered to customers. *Id.* Brian Gilbertson forwarded those numbers to Mr. Dore and added that "from a big picture perspective, we have about $4.5mm in transit or in-basin, $4.5mm in WIP [work in process], [$]600K in finished goods at dry plant, and approx. $4mm in stripping, mining, and crushing costs for a grand total of approx. $13mm in total inventory." PX145.

9

At trial, Brian Gilbertson testified that because Mr. Dore's inquiry "seemed like a pretty off-the-cuff request . . . I think I gave him some quick, you know, napkin math." Tr. 1403:6–11. Although Ms. Christenson had sent Brian Gilbertson a copy of the August inventory reconciliation, which indicated that there was "support" for inventory in the amount of $9,917,729.54, PX144-1, Brian Gilbertson testified that he did not recall seeing that document, but instead went "right to" the spreadsheet containing the number of tons of sand en route and in basin, from which he made his rough calculation of $13.5 million as the value of the inventory as of August 31. Tr. 1404:16–1405:7.

With respect to the financials for September 30 that Mr. Hajas had requested, Mr. Wills sent Mr. Brady an email on October 10 stating that he had "[w]orked through the inventory adjustment" for September 30, 2018, "based upon the [August 31, 2018,] methodology," and that it appeared to show a $2.58 million increase to inventory. After the adjustment,[6] he said, the inventory would be approximately $16 million. PX140. He asked, "Does this make sense and seem reasonable?" *Id.* Mr. Brady responded: "The amount is a little higher than I expected, however, we should continue utilizing the methodology in place. Darren [Kray]—what do you think?" *Id.* Mr. Kray replied: "I agree we should use the consistent methodology—not sure [if] the $16 million sounds reasonable or not—not sure what volumes there were at the end of September. If production was consistent with prior months and sales were down would make sense that there was an increase [in] inventory volume at September 30, 2018." *Id.* He added, "Maybe book the entry and see what the financial statements look like." *Id.*

---

[6] An inventory "adjustment" is an entry made to the company's accounting records to align the company's records with the amount of inventory actually in the company's possession. NIS's accounting records were kept using a software application called QuickBooks.

On October 12, 2018, Mr. Brady provided Mr. Hajas and Mr. Dore with the September 2018 financials.  PX149.  Those financials listed an inventory value of $16,035,352 as of September 30, 2018, which was also the end of the third quarter.  *Id.*  Brian Gilbertson provided a breakdown of the tonnage underlying that inventory number to the plaintiffs, but did not provide any explanation of how the $16 million inventory figure was derived.  *See* PX156.  However, materials prepared by Matt Wills of Carlson Advisors shed light on the manner in which that number was derived.  *See* DX212.  It appears from those materials that the cost of goods sold for the period of January through September 2018, as shown by NIS's accounting records, was $52,086,754.94, yielding an inventory value of $13,437,559.71, and that the reconciled cost of goods sold as of September 30, 2018 (applying the method that Mr. Wills discusses in PX140), was $49,500,628.77, which required an upward adjustment to inventory of $2,586,126.17.  Mr. Wills' analysis therefore produced a calculated inventory for September 30, 2018, based on the cost of goods sold, of $16,023,685.88.[7]

Prior to the closing date for the sale, the parties agreed that the plaintiffs would purchase not only Mr. Gilbertson's personal interest and RRG's interest in NIS, but also the interests held by the other defendant entities.  The agreement was thus modified to provide for the sale of the other entities' interests in NIS, including their Class B shares of the company.

The EPA contained several clauses that imposed warranties and duties of disclosure on the defendants.  In Section 2.7 of the agreement, the defendants warranted that the financial statements provided to the plaintiffs prior to the sale "fairly reflect, in all material respects, [NIS's] financial

---

[7]  Mr. Wills' inventory figure is consistent with the "Production Inventory" account that appears in NIS's QuickBooks records as of September 30, 2018.  DX217.001.  That number, added to the $11,665.80 in the "Inventory Asset" account, results in the $16,035,352 inventory figure that appeared in the company's September 30 financial statements.  *See id.*; PX159-1.

performance as [of] the dates and during the periods presented" and reflected any "material obligation" or "contingent liability."  PX001 at § 2.7(a).  In Section 2.8 of the agreement, the defendants warranted that since December 31, 2017, there had not been any "change or effect that . . . has had or would reasonably be expected to have a material adverse effect" on the company's business, condition, assets, or liabilities.  *Id.* at § 2.8.  In Section 2.9, the defendants warranted that the company had no liabilities or obligations except for "liabilities accrued for on the Financial Statements" or "liabilities arising in the ordinary course of business since the date of the Financial Statements that are neither material in amount or effect."  *Id.* at § 2.9.

Finally, Section 2.15, the provision of the EPA that has been a focus of this litigation, stated as follows in pertinent part:

> Contracts.  Schedule 2.15 lists each material contract to which any Company Entity is a party or by which any of their respective assets are bound, including the Leases (each contract so listed or required to be so listed being a "Major Contract").  Seller has delivered to Purchaser a true, correct and complete copy of each Major Contract.

*Id.* at § 2.15.  In Schedule 2.15, the defendants listed ten contracts for Northern Industrial Sands, LLC, including road agreements with local Wisconsin governmental entities, a lease agreement covering certain property in Wisconsin, and the set of loan agreements with the Dougherty investment bank.  PX001.037–38.  No other contracts were listed for Northern Industrial Sands, LLC.  *See id.*

The sale closed on October 17, 2018.  Following the closing, Mr. Hajas and Mr. Dore embarked on a "deep dive" into the operations of the company.  Tr. 213:5–215:6, 435:10–436:21; PX168.  According to their testimony, they soon discovered a number of contracts that had not been listed in Schedule 2.15 of the EPA, but which imposed continuing obligations on NIS.  Those

contracts included six undisclosed contracts that form the basis for the plaintiffs' claim that the defendants breached Section 2.15 of the EPA.[8]  Those undisclosed contracts are the following:

Chetek Express.  NIS entered into contracts with Chetek Express, a trucking company, to haul sand between NIS's Wisconsin sand mine and its wet and dry processing plants, as well as to haul wet sand purchased from Sioux Creek Silica, LLC, ("Sioux Creek") from the Sioux Creek mine to the NIS dry plant.  Chetek Express was owned by Chris Johnson, Ryan Gilbertson's cousin, and Ryan Gilbertson at one point had an ownership interest in the company.  Tr. 57:3–25, 535:9–537:4, 675:9–22.  The Chetek Express contract originally contained a monthly minimum hauling provision, which guaranteed that Chetek Express would be engaged to haul at least 30,000 tons of sand per month, with a penalty clause of $1.50 per ton for any shortfall.  PX004 at 6.  That contract was later amended to increase the monthly minimum to 60,000 tons of sand per month beginning in March 2019.  PX005 at ¶ 6.  The combination of the mandatory minimum commitments and the penalties for shortfalls could have exposed NIS to penalties of up to $90,000 per month for the duration of the contract, which ran through October 2022.  *See id.*  The plaintiffs acknowledge that they were aware that NIS was using Chetek Express to haul sand, but they assert that they did not know that NIS had a binding contract with Chetek Express containing mandatory minimums and shortfall penalties.

RJR Trucking, LLC.  In September 2018, while the parties were negotiating for the sale of the company, NIS entered into a contract with RJR Trucking, LLC, ("RJR").  That contract

---

[8]  In their proposed findings of fact and conclusions of law, the plaintiffs also suggest that they were injured by the defendants' failure to disclose a contract between NIS and Marathon Oil Company ("Marathon").  *See* Dkt. No. 269 at 23.  That allegation was not pursued in detail at trial, but in any event the plaintiffs have not alleged any amount of damages that would be attributable to the non-disclosure of that contract.  *See* Tr. 1626:6–1627:4 (testimony of Dr. Timothy Nantell, the plaintiffs' damages expert).  I will therefore not consider the non-disclosure of the Marathon contract as a basis for determining whether the defendants breached Section 2.15 of the EPA.

provided that RJR would transload sand from railroad cars and onto trucks that would be used to deliver the sand to NIS's customers.  The contract committed NIS to engage RJR for certain minimum monthly quantities of transloading services, with a 100% penalty for failure to satisfy the monthly minimums.  That provision of the contract left NIS exposed to a minimum monthly fee of $60,000 even if RJR was not called upon to transload any sand.  The plaintiffs introduced testimony that Ryan Gilbertson told them prior to the closing that the RJR contract was terminating in October 2018 and that there was no need to renew the contract, because NIS could buy transloading services without commitments. Tr. 72:13–74:18.  According to the plaintiffs, Mr. Gilbertson failed to disclose that with his approval NIS had entered into a new agreement with RJR, and that the new agreement would bind NIS to a monthly minimum commitment through at least September 2019, with the possibility of further renewal.  *See* PX006 at 1–2.

Sioux Creek Silica.  NIS entered into a contract with Sioux Creek, another sand mining company with a mine not far from NIS's Chetek site, in October 2017.  The contract with Sioux Creek bound NIS to purchase 250,000 tons of sand from Sioux Creek at $12 per ton.  In April 2018 NIS entered another agreement to purchase an additional 250,000 tons of sand at the same price.  Mr. Dore was made aware of the Sioux Creek contract prior to the execution of the EPA, but the plaintiffs contend it was not made clear to Mr. Dore that the contract contained a mandatory minimum purchase requirement at the stated price.

Continental Intermodal Group LP ("CIG").  In February 2017, NIS entered into a contract with CIG for transloading services.  The contract required NIS to pay at least $120,000 per month for approximately two years and provided for a 100% penalty for any shortfall in the amounts transloaded.  The plaintiffs assert that Mr. Hajas and Mr. Dore were not aware of the company's

commitment to pay $2.8 million to CIG during the pendency of the contract even if CIG transported little or no sand.

SMBC Rail Services LLC.  In April 2017, NIS entered into a contract with SMBC to lease rail cars to be used to transport sand to railheads near the ultimate destination for the product.  The lease agreement imposed costs of about $200,000 on NIS and included an obligation for NIS to pay for insurance on and repairs to the railcars that it leased.  That contract was not disclosed in Schedule 2.15 of the EPA, and Mr. Hajas and Mr. Dore stated that they were unaware of the extent of the commitments in the lease agreement.

Mascoutin Heights Leasing Co.  In early 2017, NIS entered into a contract with Mascoutin Heights Leasing Co. LLC ("Mascoutin Heights") to lease rail cars for a minimum of three years.  That contract exposed NIS to potential costs of more than $400,000 per year.  The contract also contained mileage fees and required NIS to return the cars to a location designated by Mascoutin Heights at the end of the lease.  That contract was not disclosed in Schedule 2.15 of the EPA, and Mr. Hajas and Mr. Dore testified that they were unaware of the extent of the commitments in the lease agreement before closing on the equity sale.

After taking control of NIS following the sale, Mr. Hajas learned of the six contracts listed above that contained continuing obligations and mandatory minimums.  In addition, following the sale Mr. Hajas and Mr. Dore reached the conclusion that the value of the company's inventory that had been quoted to them at the time of the sale was overstated by approximately $7 million.

Following the plaintiffs' purchase of the defendants' equity in NIS, the market for northern white frac sand collapsed due to decreasing oil prices, which led drilling companies to experiment with using local sand that was cheaper to produce and ship.  Tr. 458:21–460:13, 695:12–18.  The

fortunes of NIS and other frac sand producers in the area sank with the market collapse, and a number of Wisconsin sand mining companies went into bankruptcy.  NIS is now in receivership.

### B.  The Parties' Contentions

Based principally on the failure to disclose the six specified contracts and on the alleged overstatement of the value of NIS's inventory at the time of the sale, the plaintiffs filed this action seeking damages from the four parties from which they purchased the equity interests in NIS.  In their complaint, the plaintiffs sought recovery of the full purchase price paid for the defendants' equity interests in the company, together with costs, attorney's fees, and punitive damages.

In addition to the undisclosed contracts and allegedly overstated inventory valuation, the plaintiffs contend that the defendants overstated the value of the company in several other ways.  In particular, they argue that the defendants booked several accounts receivable at full value and did not reveal to the plaintiffs that those accounts receivable were unlikely to be recoverable in full.  They also argue that the defendants failed to accrue expected bonus payments to NIS employees in 2018, which they contend should have been accrued under appropriate accounting procedures.  With respect to the accounts receivable, the defendants respond that the plaintiffs were aware of the accounts receivable and were able to place their own valuation on those receivables.  With respect to the bonuses, the defendants responded that the bonuses were not expected and that, as such, they were not required to be accrued for purposes of NIS's financial statements.

At trial, Mr. Hajas testified that he regarded the minimum purchase provisions, fixed lease agreements, and penalty clauses in the six undisclosed contracts as antithetical to what he was seeking when he purchased NIS.  He testified that he was interested in a company that was "nimble," i.e., a company that could reduce its expenses during down times without having long-

term commitments that would continue to burden the company even when its sales were low.  Tr. 56:12–20.  Mr. Hajas testified that he was looking for a company that was profitable as is, that he was "not in the business of fixing up distressed, in-trouble businesses," and that because of the continuing obligations under the six undisclosed contracts, the true state of NIS was precarious, inflexible, and subject to significant risk in a down market.  Tr. 243:8–21.  The contractual obligations that he learned of after the sale, he testified, left him concerned about the viability of the company.  He testified that if he had he known about those provisions and the true state of the company's inventory as of the closing date, he would not have gone through with the purchase of the defendants' equity interests in NIS.  Accordingly, the plaintiffs seek recovery of the full amount of the payment they made for the equity interest in NIS, or $11,115,247.72.

In the alternative, the plaintiffs seek expectation damages on the ground that if the defendants had made full disclosure of the company's condition, the price would have been reduced by $7,617,636.  The plaintiffs reach that number by relying on the opinion of their damages expert, Dr. Timothy Nantell, who analyzed the transaction and concluded that if the financial statements were corrected and a conservative 20% discount were made to account for the risks associated with the undisclosed contracts and the accounts receivable, the price for the purchased equity would have been $3,497,610, leading to a damages assessment of $7,617,637.  Using an alternative valuation method, he testified that the price should have been $3,963,877, which would result in damages of $7,151,371.

For their part, the defendants argue that the inventory values provided to Mr. Hajas and Mr. Dore shortly before the closing were not inflated.  They also argue that the six contracts that the plaintiffs contend should have been disclosed in Schedule 2.15 of the EPA were not material contracts.  In addition, they argue that Mr. Hajas or Mr. Dore were aware of some of those contracts

17

and could have inquired about others during the due diligence period, but did not.  The defendants also contest the plaintiffs' contention that there were material misrepresentations or omissions with respect to those issues and others.  In so doing, the defendants rely heavily on the evidence that the personnel at NIS were cooperative with Mr. Hajas and Mr. Dore during the due diligence period and provided them free access to any financial information regarding the company that they wished to see.

## DISCUSSION

### A.  The Breach of Contract Claim

#### 1.  The "Inflated Inventory" Component

The first of the two principal components of the plaintiffs' breach of contract claim is their contention that the defendants breached the warranties in the EPA by inflating the value of NIS's inventory of sand during the period leading up to the equity sale.  In particular, the plaintiffs allege that the financial statements they received from NIS inaccurately stated the amount of NIS's inventory on the company's balance sheet on several occasions during that period.  That error resulted in a corresponding understatement of the cost of goods sold account on NIS's income statement.  Specifically, the plaintiffs allege that NIS's inventory was overstated by $6,983,575 in the third quarter financial statements and that as a consequence the company's EBITDA was overstated by the same amount.

Shortly after the closing of the equity purchase, Mr. Dore calculated a "derived inventory" for NIS as of year-end 2018 in connection with NIS's 2018 audit.  Tr. 889:7–10.  NIS hired a third party to conduct a "drone survey," which was used to determine the volume of sand that was present in various phases of the production process.  *Id.* at 870:22–871:6.  Those volumes were then multiplied by the costs associated with each phase of production.  *Id.* at 888:11–17.  The

18

derived inventory value indicated that the book value of the company's inventory as of December 31, 2018, was overstated by $2.974 million.  *Id.* at 889:25–890:8; DX217 at 7.  As Mr. Dore acknowledged at trial, however, that calculation did not indicate what the true inventory value would have been as of September 30, 2018.  Tr. 905:13–17.

In his capacity as an expert witness in this case, Mr. Dore attempted to use his "derived inventory" approach, i.e., multiplying the number of tons of sand in each phase of production by the costs associated with each phase, to calculate the true value of NIS's inventory as of September 30, 2018.  Mr. Dore began by using his approach to validate the year-end inventory from the 2017 audited financial statements.  *Id.* at 1445:9–1446:6.  His derived inventory approach yielded an inventory value that was within one percent of the inventory value that was listed in the audited 2017 year-end financial statements.  *Id.* at 1446:22–1447:1.  Because he was able to replicate the 2017 year-end inventory amount, Mr. Dore considered his approach to be valid.  He then used his approach to calculate the inventory as of September 30, 2018.  His calculation yielded an inventory value of $9,051,777, which in his view indicated that the September 2018 financial statements overstated the value of NIS's inventory by $6.98 million, or 77 percent.  *Id.* at 1455:7–19.  Mr. Dore testified that he was not able to locate the source of any error in the August and September 2018 financials, and that he believed the inventory adjustments made for those two months were simply "fictitious."  Tr. 1511:1–1512:12.

Mr. Dore's expert testimony regarding the inventory is largely conclusory in nature, and there was no evidence introduced at trial that would enable the court to validate his analysis.[9]  *See*

_____

[9] Along with their letter brief submitted after the closing arguments, the plaintiffs provided a spreadsheet that purports to validate Mr. Dore's "derived inventory" analysis.  *See* Dkt. No. 272-1 (rows 8–12).  That spreadsheet was not introduced into evidence at trial, and the defendants were not able to cross-examine Mr. Dore with respect to the calculations contained in the spreadsheet.  In any event, even if Mr. Dore's "derived inventory" calculations are correct, the spreadsheet does

Tr. 1496:20–1499:7 (Mr. Dore failing to identify record evidence that the court could use to "cross-check" his analysis).  Given the lack of corroborating evidence and the fact that Mr. Dore is not an independent expert, but instead is closely affiliated with the plaintiffs, I find that Mr. Dore's testimony that the company's inventory was overstated on the September 2018 financials does not provide compelling support for the plaintiffs' claim on the inventory issue.

Through Mr. Dore's testimony, the plaintiffs mount a challenge to Brian Gilbertson's "napkin math," in which Brian Gilbertson used a cost basis to account for the $13 million in inventory by combining (1) the cost associated with sand in transit or in basin (i.e., at the destination), which he estimated to be $4.5 million; (2) the cost associated with work in process, which he estimated to be $4.5 million; (3) the cost associated with finished goods at the dry plant, which he estimated to be $600,000; and (4) the costs associated with stripping, mining, and crushing, which he estimated to be $4 million.  *See* PX145.

Mr. Dore admitted that at the time he first received Brian Gilbertson's email containing that explanation of the August 31 inventory, the explanation sounded reasonable.  Tr. 928:2–18. At trial, however, Mr. Dore contended that the explanation was not reasonable because, in Mr. Dore's view, costs associated with stripping, mining, and crushing are properly treated as part of the costs associated with work in process, and thus Brian Gilbertson double-counted the stripping, mining, and crushing costs, making it improper for him to count those costs separately as part of his explanation for the approximately $13 million in inventory as of August 31, 2018.  *Id.* at 929:25–934:10.  Mr. Dore also contended that he was not aware that Ms. Christenson had sent an

---

not address whether, as discussed in more detail below, the methodology employed by Carlson Advisors in calculating the August and September 2018 inventory amounts was improper. Accordingly, I attribute only minimal weight to the spreadsheet attached to the plaintiffs' post-trial letter and found at Dkt. No. 272-1.

inventory reconciliation document to Brian Gilbertson that provided support for only $9.9 million worth of inventory.[10]  Tr. 1118:24–1120:6.

In support of his contention that Brian Gilbertson double-counted the stripping, mining, and crushing costs, Mr. Dore cited NIS's balance sheet for September 30, 2018, which listed "prepaid stripping" in a separate account from inventory.  Mr. Dore testified that stripping expenses are typically booked to the prepaid stripping account, and then re-allocated to inventory as sand is removed from the ground.  Tr. 929:25–934:10.  He added that "as soon as the sand comes out of ground it becomes WIP," and it remains WIP "until it becomes finished goods, which is at the point after it is dried in the process."  Tr. 939:5–12.  Therefore, those costs would already have been included in the WIP component of inventory, so it was improper for Brian Gilbertson to count those costs again as part of his "napkin math."  Tr. 929:25–930:9.

There are several problems with the plaintiffs' reliance on that evidence.  First, the prepaid stripping listed on the NIS balance sheet referred to by Mr. Dore was only about $548,000, i.e., only about three percent of the amount listed for inventory, while Brian Gilbertson allocated some $4 million to stripping, mining, and crushing, or about one-third of the amount of the inventory for August 31, 2018.  See DX217.001; PX145.  That difference strongly suggests that the "prepaid stripping" costs did not cover all the costs that fell within Brian Gilbertson's category of stripping, mining, and crushing.  Second, if Mr. Dore were correct that the $4 million for stripping, mining,

---

[10]     As discussed in further detail below, the inventory amounts on the August and September 2018 financial statements were the product of a new approach to calculating inventory. Rather than basing the inventory on the estimated number of tons of sand in each phase of production, as had historically been done by Ms. Huhn, Carlson Advisors based its inventory calculations on the costs to produce all of the sand that had been sold year-to-date.  Ms. Christenson's reconciliation document, at PX144-1, appears to base its calculation on the estimated tons in each phase (i.e., the prior approach) rather than on the year-to-date cost of goods sold.

and crushing was already included in the WIP costs, that would leave only $500,000 for all the other steps in processing the product, which typically entail a much higher percentage of the costs than that. *See* PX139-1 ("Stat-COGS" worksheet). Third, even if Brian Gilbertson used a different convention than was used by Carlson Advisors or others at NIS in distributing costs into different buckets, that does not mean that he engaged in double counting, or that his total estimate of the inventory valuation was in error. And finally, it is important to note that Brian Gilbertson does not appear to have been heavily involved in the preparation of the August and September 2018 financial statements. He was not included on a number of emails in which Ryan Gilbertson, employees of Carlson Advisors, or the plaintiffs discussed the financial statements generally or the inventory figures in particular. *See, e.g.*, PX133; PX136; DX088; IX01; IX18; JX13. Brian Gilbertson's "napkin math" is therefore best viewed as his personal, informal effort to account for the numbers generated on the financial statements, rather than evidence of how the numbers on the financial statements were actually derived. That is especially true given Mr. Kray's representation that Carlson Advisors itself "calculated the cost of goods sold for the eight month period ended August 31." DX088.[11]

Turning to the financial statements, there are reasons to believe that the $13.5 million and $16 million inventory numbers that appeared in the August and September 2018 financial statements were accurate. First, after receiving the financials from Mr. Brady and before sending them to the plaintiffs, Mr. Gilbertson asked Mr. Kray to confirm that the financials were "solid . . . as an independent source," and Mr. Kray responded with an explanation of how the

---

[11] Curiously, neither side called Mr. Kray or Mr. Wills from Carlson Advisors, nor did they call Ms. Christenson or Ms. Huhn, who worked for NIS, all of whom were involved in the events preceding and surrounding the generation of the inventory estimates for August 31 and September 30, 2018.

financials were prepared.  DX088.  Second, the company auditors at the accounting firm Olsen

Thielen reviewed the company's September 2018 financial statements in connection with the 2018

year-end audit and concluded that "[t]he balances appear reasonable and no additional [audit]

procedures [are] considered necessary."  DX073.  The Olsen Thielen auditors also reviewed the

2018 general ledger activity, which would include the adjusting entries to inventory for August

and September of 2018, and they noted "nothing unusual" in that activity.  DX138.  Third, the

plaintiffs relied upon the third quarter financials that they now assert were inaccurate when they

made a presentation to Dougherty in February 2019.[12]  *See* Dkt. No. 268 at 24 (comparing the

financial statements with the numbers used in the presentation to Dougherty).  Fourth, the plaintiffs

never restated the third quarter financials even after they concluded that those financials were

inaccurate.  Tr. 364:18–20, 827:2–5.  And finally, although there is no reconciliation in the record

supporting the August inventory adjustment, the defendants introduced evidence supporting the

$2.5 million adjustment that was made in September 2018.  *See* DX212.

Another reason to question the plaintiffs' contention that the inventory values for August

and September 2018 were inflated is that NIS adopted a different method for measuring inventory

as of August 2018.  As Ryan Gilbertson explained in his October 9, 2018, email to Mr. Hajas and

Mr. Dore, he concluded that the inventory measurement method used by Ms. Huhn had understated

inventory.  The new method entailed looking to the cost of goods actually invoiced over the course

of the year to measure inventory.  The evidence showed that NIS used that method to prepare the

company's financials for August 31 and September 30, 2018.  *See* DX212.

---

[12]  Mr. Hajas testified that the inventory error, as he perceived it, was discovered in the fourth quarter or 2018 or the first quarter of 2019.  Tr. 486:25–487:6.

As noted, for the August and September 2018 financials the evidence showed that the defendants calculated inventory based on the year-to-date cost of goods sold.  I find that the numbers used by the defendants to determine the cost of goods sold were not "fictitious," as the plaintiffs contend, *see* Tr. 1506:7, 1512:4, but were the product of the revised method of calculating inventory.  The inventory reconciliation worksheet sent by Mr. Wills to Mr. Brady illustrates that, in calculating the cost of goods sold through September 2018, the defendants assumed that each ton of sand sold cost $19.02 to produce (not counting the freight and transload expenses to deliver the sand to the drilling sites).  DX212; *see also* PX130 ("[T]his cost of goods sold reconciliation assumes that sand sold has a cost of $19.02 per ton, as we discussed . . . .").  That $19.02 figure was not selected randomly.[13]  The June 2018 financial statements indicate that the average cost per ton of sand produced at the dry plant was $19.02.  PX082-1 ("Stat-COGS" worksheet), and Mr. Hajas confirmed in his testimony that it cost "about [$]19 to $20 to put a ton of sand into a railcar," Tr. 491:4–6.  Mr. Wills' reconciliation worksheet indicates that the actual cost to produce and ship all the sand sold (which would include the $19.02 cost to produce plus freight costs and other expenses) was compared against the cost-of-goods-sold balance listed in QuickBooks, and an adjusting entry (i.e., a "COGS adjustment") was made to reconcile the two.  *See* DX212.  The corresponding journal entry was made to the inventory account, resulting in the

---

[13]   The plaintiffs argue that it does not matter whether Mr. Wills' reconciliation can be "reverse-engineered" if the inventory was nevertheless inaccurate. Dkt. No. 276 at 2.  I disagree. If it is possible to reverse engineer the inventory number that appeared on the September 2018 financials, the results of that effort may shed important light on how that number was derived.  If there is a basis for the inventory number that appeared in the financial statements, and there are no apparent errors in the calculation or issues with the underlying calculation methodology, those facts would weigh heavily against the plaintiffs' argument that the inventory was overstated or that it was "fictitious," as Mr. Dore asserted at trial.

inventory adjustment that the plaintiffs claim was fictitious.  *See id.*  The plaintiffs have not offered any basis to believe that this general approach to calculating inventory was improper.

In the letter brief that they filed after closing arguments in the case, the plaintiffs suggested in a footnote that Mr. Wills' inventory reconciliation was inaccurate because it understated freight costs by approximately $2.9 million and because it did not include brokerage costs of approximately $3.45 million.  Dkt. No. 272 at 6 n.6.  Those discrepancies, in the plaintiffs' view, account for most of the overstatement to inventory that they claim was present in the September 2018 financials.  *Id.*  After reviewing the footnote in the plaintiffs' letter, I entered an order explaining my tentative analysis and requested that the parties respond.  Dkt. No. 275.  In responding, the plaintiffs argued that my tentative analysis was erroneous in several respects. After carefully considering the plaintiffs' submissions, I find their arguments to be unpersuasive and conclude that the discrepancies identified by the plaintiffs are not evidence that Mr. Wills' reconciliation was inaccurate.

With respect to the freight costs, the plaintiffs are correct that Mr. Wills' inventory reconciliation appears to reflect a lower amount of freight costs than is shown in QuickBooks. DX212.  The apparent discrepancies between Mr. Wills' freight cost numbers and the corresponding numbers in QuickBooks appear to be attributable to the way NIS recorded expenses in QuickBooks.  Expenses appear to have been added to the freight expense COGS account in QuickBooks on the day they were incurred; that is, if NIS incurred a cost to ship a rail car on September 30, that expense would be booked into QuickBooks as of September 30, even if the invoice was paid later and regardless of when the sand in that car was actually sold.  For that reason, the QuickBooks records for freight costs likely included freight costs that were attributable

to sand that was en route or in basin but had not yet been sold.[14]  *See also* PX139 (noting that Mr. Wills' inventory reconciliation "accounts for rail costs . . . based on the tons sold in basin").

It is possible to estimate the freight costs that are attributable to sand that was en route and in basin, and that estimation further supports the inference that the supposedly "missing" freight costs were actually attributable to sand that had not yet been sold.  The evidence showed that 47,595 tons of sand were in basin and 20,010 tons of sand were en route as of September 30, 2018.  PX156.  Although the record does not appear to show the breakdown of tons between the Jal, New Mexico, transload facility and the Oklahoma transload facilities, data from August 2018 indicates that 40.8 percent of the en route and in basin sand was at or en route to the Jal facility and 59.2 percent was at or en route to the Oklahoma facilities.  *See* PX144-1.  Assuming that those ratios remained roughly true in September 2018, one can estimate that the weighted average cost to ship

_____

[14]  The plaintiffs argue that in NIS's QuickBooks records freight expenses were initially added to the inventory account and then moved to the freight expense COGS account for each ton of sand that was sold.  *See* Dkt. No. 276 at 1.  As a result, they argue, the QuickBooks balance for freight expense COGS as of September 30, 2018, does not reflect costs that were attributable to sand that had not yet been sold.  That assertion, however, is not supported by the NIS QuickBooks records.  The only times the QuickBooks inventory balance changed in 2018 were when an inventory adjustment was made at the end of each month.  *See* PX205.  There do not appear to have been any debits or credits made to the inventory account to accrue freight expenses or transfer them to COGS when tons of sand were sold in 2018.  *See id.*  Moreover, the entries to the freight expense COGS account in QuickBooks appear to correspond to invoices payable to the shipper (e.g., Union Pacific railroad) rather than to sand sold to NIS's customers.  *See id.*  At bottom, the plaintiffs' argument rests on the *ipse dixit* assertion that, because the freight expenses are listed under the "cost of goods sold" category in QuickBooks, that account must only include expenses attributable to sand already sold.  *See* Dkt. No. 276 at 1.

The plaintiffs also allege that "the August/September method" of calculating inventory failed to "add the freight cost to COGS or reduce the inventory accordingly."  *Id.*  However, a review of the entries to the inventory account in QuickBooks does not indicate that the inventory and COGS accounts were treated any differently in August and September than they were in the other months in 2018.  *See* PX205.  Ultimately, I find that there is no basis to conclude that freight expenses were initially added to inventory and then moved to COGS as tons of sand were sold, as the plaintiffs assert.  If anything, the monthly inventory adjustments, such as those at issue here, appear to have served the purpose of allocating expenses between the QuickBooks COGS and inventory balances.

Case 1:19-cv-00046-WCB-SRF   Document 281   Filed 08/18/22   Page 27 of 53 PageID #: 7645

one ton of sand was $43.56.  Notably, multiplying the number of tons of sand en route and in basin by $43.56 per ton of sand amounts to approximately $2.945 million in freight costs, which is within two percent of the discrepancy in freight costs identified by the plaintiffs.

Mr. Wills' reconciliation appears to be an effort to account for the costs actually attributable to the sand sold year-to-date as of September 30, 2018, which would not necessarily be reflected in the QuickBooks balance for freight costs.  I therefore attribute no weight to the discrepancy identified by the plaintiffs with respect to freight costs.

As for the brokerage costs, the plaintiffs correctly point out that Mr. Wills' reconciliation does not explicitly list as a component of its cost of goods sold calculation the $3.45 million in brokerage costs that are shown in QuickBooks.  However, the plaintiffs overlook that Mr. Wills' overall calculation of production COGS resulted in a number that was approximately $3.7 million higher than that shown in the QuickBooks "Production COGS" balance.  Upon close examination, the discrepancy between Mr. Wills' calculation of production COGS and the QuickBooks "Production COGS" balance appears to account for the brokerage costs that the plaintiffs assert are "missing," as explained below.

There are two components of Mr. Wills' reconciliation that combine to form his calculation of production COGS.  First, Mr. Wills multiplied the number of tons of sand that had been sold year-to-date by $19.02 per ton.  That calculation alone resulted in an amount that was $2.5 million higher than the QuickBooks "Production COGS" balance.[15]  *See* PX205; DX212.  Second, the NIS

---

[15]  As shown in PX205, QuickBooks lists the "5090 Production COGS" balance as $14.43 million for the period of January 1, 2018, through September 30, 2018, which would appear to be approximately $5.1 million lower than Mr. Wills' calculation.  However, that QuickBooks balance includes the COGS adjustment that was made for September 2018 as a result of Mr. Wills' reconciliation.  For purposes of determining whether and to what extent there were discrepancies between the QuickBooks balances and the amounts shown in Mr. Wills' reconciliation, the operative QuickBooks balances are those that were present in QuickBooks at the time Mr. Wills

QuickBooks records also include $1.2 million in reclamation expenses in "Production COGS," whereas Mr. Wills broke those reclamation costs out separately.  *See* PX205; DX212.[16]  Mr. Wills' inventory reconciliation therefore reflected a total production COGS amount that was $3.7 million higher than the QuickBooks balance for "Production COGS."[17]

The brokerage costs referred to by the plaintiffs are listed in QuickBooks as "5950 Trading Cost of Goods Sold."  PX205.  That is, those brokerage costs are costs attributable to "trading sand" rather than "production sand."  In his inventory reconciliation, Mr. Wills accounted for the costs associated with trading sand by including them in his calculation of production COGS.  *See* DX212 ("SALES 8.31.2018 YTD" worksheet, including sales of both production sand and trading sand).  Notably, the $3.45 million in brokerage costs accounts for approximately 93 percent of the $3.7 million discrepancy between Mr. Wills' production COGS amount and the QuickBooks

---

conducted his reconciliation.  Because the September 2018 COGS adjustment was entered into QuickBooks after (and as a result of) Mr. Wills' reconciliation, it obviously should not be considered as part of the QuickBooks "Production COGS" balance for purposes of the present analysis.  Excluding that adjustment, the QuickBooks production COGS balance was $17.02 million at the time Mr. Wills conducted his reconciliation, which is $2.5 million lower than the number that appears in Mr. Wills' spreadsheet.  *See id.*

[16]  In QuickBooks, reclamation costs are tracked using the "5400 Reclamation Expenses" account, which is part of the "5090 Production COGS" balance discussed in footnote 15, *supra*.  PX205.

[17]  The plaintiffs argue that the court's analysis of this issue should also exclude the $4.4 million inventory adjustment made in August 2018 because Mr. Wills' analysis attempts to calculate the year-to-date cost of goods sold.  Dkt. No. 276 at 2.  There are two problems with that argument.  First, the question presented by the plaintiffs' assertion that the brokerage costs were "missing" from Mr. Wills' reconciliation is whether the brokerage costs were accounted for when Mr. Wills conducted his analysis for September 2018.  Regardless of the accuracy of the August 2018 adjustment, it would have been present in the QuickBooks records at the time of his reconciliation (unlike the September adjustment, which was made as a result of his analysis), and therefore should not be excluded for purposes of evaluating Mr. Wills' calculation of production COGS.  Second, to accept the plaintiffs' reasoning would seem to require that all of the COGS adjustments for the months of January through July be excluded from the production COGS balance, yet the plaintiffs do not advocate any such measure.

"Production COGS" balance.[18]   Accordingly, I do not find that Mr. Wills' failure to explicitly include brokerage costs in his inventory reconciliation is evidence that his calculations were inaccurate in any respect.

In any event, the exchange of emails and text messages between Mr. Gilbertson and Messrs. Hajas and Dore between October 9 and October 15, 2018, show that Mr. Gilbertson and others at NIS disclosed the total amount of sand en route and in basin and disclosed that NIS was using a revised method for accounting for inventory, which resulted in higher inventory values for August and September 2018.  *See* PX212.012; PX136; PX139; PX156; PX159.  Thus, the use of a new methodology for calculating inventory and the explanation for the higher inventory values for August and September 2018 were not concealed from the plaintiffs.

While the evidence on the inventory issue leaves some questions unanswered, the overriding problem for the plaintiffs is that they bear the burden of proof on this issue.  And after assessing all the evidence offered by the parties regarding the 2018 inventory values, I find that the plaintiffs have not proved by a preponderance of the evidence that the inventory numbers on the August and September 2018 financial statements were inaccurate.  In particular, the plaintiffs' failure to call, either live or by deposition, accountants Darren Kray and Matt Wills, and accounting assistant Megan Christenson, all of whom were deeply involved in calculating NIS's inventory

---

[18]   The plaintiffs argue that the court's analysis fails to consider that NIS's QuickBooks records do not include brokerage costs in the "Production COGS" balance.  Dkt. No. 276 at 2.  That argument misunderstands the court's analysis.  The $3.7 million discrepancy between Mr. Wills' production COGS and the QuickBooks Production COGS balance is largely attributable to the fact that Mr. Wills included brokerage costs in production COGS, whereas the QuickBooks records do not.  Put another way, if Mr. Wills had listed the brokerage costs separately in DX212, rather than as part of production COGS, there would be a discrepancy of only about $250,000 between the production COGS in DX212 and the pre-adjustment QuickBooks Production COGS balance, which is much less than the $3.45 million in "missing" brokerage costs that the plaintiffs allege.

values for August 31 and September 30, 2018, left a serious gap in the plaintiffs' proof on the inventory issue. In addition, the lack of corroborating evidence supporting Mr. Dore's expert testimony is troubling, particularly in view of the evidence supporting the numbers that appeared on the financial statements. Accordingly, I find that the plaintiffs have not met their burden of showing that the defendants breached the Equity Purchase Agreement by providing financial statements with inaccurate inventory amounts.

Furthermore, even if the $13.5 million and $16 million inventory figures that appeared in the financial statements were inaccurate, the plaintiffs have not established that those numbers played any role in the final purchase price. As early as September 14, 2018, nearly one month before the plaintiffs received the August and September financial statements, Mr. Hajas made his offer of $6.5 million for Mr. Gilbertson's interests in NIS. PX117. When Mr. Hajas later lowered that offer to $6 million, the reasons he gave for that change in the price were "market movement" and a reduced EBITDA forecast. Those factors, Mr. Hajas said in an October 8, 2018, email, justified the "modest reprice" of $500,000. PX133; Tr. 604:15–24; *see also* Tr. 323:12–324:10 (Mr. Hajas discussing his reasoning for requesting a reprice). At that time, NIS's financials valued the inventory as of August 31, 2018, at about $8.7 million. PX126.002 (October 1, 2018, email from Tim Brady to Shane Dore). The revised inventory values of $13.5 million for August 31 and $16 million for September 30 were provided to Mr. Hajas and Mr. Dore between October 9 and 12. PX136; PX136-1; PX143; PX143-1; PX149. I find that the adjusted inventory values for August and September, which surfaced only a week before the closing, had no effect on the plaintiffs' decision to go through with the equity purchase or the price they were willing to pay, particularly in light of the fact that the parties' negotiations over price were predicated on the

inventory value of about $8.7 million that Mr. Hajas assigned to the company in his August valuation.  DX183.

In sum, based on the foregoing analysis I find that the plaintiffs have not proved that the adjustments to inventory value between August and October 2018 violated the defendants' warranties in the EPA.  In any event, I find that the adjustments did not result in injury to the plaintiffs by causing them to make an investment they otherwise would not have made or by paying more for that investment than they otherwise would have paid.

### 2.  The "Undisclosed Contracts" Component

The other principal component of the plaintiffs' breach of contract claim consists of the six undisclosed contracts that the plaintiffs contend were material to the transaction and should have been disclosed pursuant to Section 2.15 of the EPA.  The plaintiffs focus particularly on the fact that each of those contracts contained provisions that required NIS to purchase a minimum quantity of goods or services over time or face financial penalties if those minimums were not met.  According to the plaintiffs, those ongoing commitments reduced the overall value of NIS and made it less "nimble" in the event of a slowdown, a factor that was important to Mr. Hajas in deciding whether to purchase the defendants' interests in NIS.

The defendants contend that the six contracts in dispute were not "material," and that the defendants were therefore not required to disclose them.  The defendants also contend that the plaintiffs were aware of the contracts even though the contracts were not specifically listed in Schedule 2.15 of the EPA.

While Mr. Hajas and Mr. Dore were aware that NIS did business with several of the vendors who were parties to the six contracts in dispute, the evidence does not show that the plaintiffs were aware of all the provisions of the contracts that imposed long-term commitments

on NIS, such as minimum required purchases of goods or services with penalty provisions if those minimums were not reached.

A theme that runs throughout the defendants' argument with respect to the six undisclosed contracts is that those contracts—even in light of the provisions requiring NIS to purchase minimum amounts of sand or services—were on the whole beneficial to the company. For that reason, they argue, the failure to disclose those contracts should not be regarded as a breach of the EPA, or at least should not result in an award of damages to the plaintiffs.

There are several problems with that argument. First, the failure to disclose material contracts is a breach of the EPA without regard to whether the contracts would have been beneficial to the plaintiffs on balance. Second, and relatedly, the purpose of the disclosure provisions in the EPA was to inform the purchasers of any hidden risks they were undertaking with the purchase. Contingent liabilities of the sort found in the six subject contracts present just such a risk, and the contract makes clear that it was not the defendants' prerogative to make a unilateral determination for the plaintiffs that those risks did not outweigh the beneficial features of the contracts. Third, even if overall benefit were a basis for mitigating the award of damages, the defendants have not made a persuasive showing as to the benefits conferred by those contracts, and in particular they have failed to show that the offsetting benefits the defendants may have obtained as a result of agreeing to the mandatory minimum provisions outweighed the risks associated with those provisions.

With respect to the six contracts at issue, I make the following findings:

First, none of the six contracts were disclosed in Schedule 2.15 of the EPA.

Second, all six contested contracts were material, in that each committed NIS to significant payments for currently supplied goods or services, and each had the potential to result in significant

financial burdens for NIS, particularly in the event of a downturn in the market for frac sand. Specifically:

- The Chetek Express contract obligated NIS to pay Chetek Express a minimum of $45,000 per month for four months of trucking services and a minimum of $90,000 per month for 44 months of trucking services, resulting in a total obligation of $4,140,000, even if the company did not use Chetek Express to do any work.

- The Sioux Creek Silica contract obligated NIS to pay approximately $2,500,000 for sand to be purchased over the remaining period of that contract even if NIS had no customers for that sand.

- The CIG contract for transloading services contained a minimum commitment of 20,000 tons per month, with a shortfall fee of $6 per ton, giving rise to an exposure of $720,000 for the remaining six months of that contract.

- The RJR contract for transloading services contained a minimum monthly fee of $60,000, exposing NIS to liability of $600,000 over the 10 months remaining in that contract.

- The Mascoutin Heights railcar lease contract committed NIS to lease 115 rail cars at $295 per car per month for 16 months, for a total expense of about $540,000.

- The SMBC railcar lease contract committed NIS to lease 99 rail cars at $450 per car per month for six months, for a total expense of about $267,000.

The defendants argue that those expenses, when compared to the annual revenues of NIS (roughly $82 million in 2018), are inconsequential and that those contracts were therefore not required to be included among the "material" contracts set forth in Schedule 2.15.

The EPA does not define the term "material," but the term is a familiar one in the law, and particularly in the context of a sale of securities. An omission in that setting is regarded as material

if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).   It can safely be assumed that in the EPA, a legal document transferring interests in securities, the term "material" was used in the sense relevant to securities transactions.   That is, a fact is "material" in this context if a reasonably prudent purchaser would want to be aware of it before purchasing the security.   *See* 17 C.F.R. § 230.405 (Securities and Exchange Commission regulation defining "material" as relating to "those matters to which there is a substantial likelihood that a reasonable investor would attach importance in determining whether to purchase the security registered").

I find that all six contracts identified by the plaintiffs were "material" within the meaning of that term as used in the EPA and therefore should have been included in Schedule 2.15.   In situations in which a contract to purchase securities calls for the disclosure of all material contracts, a reasonably prudent investor would want and expect to be informed of any contracts that would impose significant ongoing financial obligations and potential risks on the purchaser.   Mr. Hajas, who had significant prior familiarity with NIS's business, would have known that the company needed to have contracts for various services required to mine, refine, transport, and deliver the sand.   For that reason, if the EPA had not contained a provision specifically requiring the disclosure of all material contracts, the failure to disclose that the company had various contracts for services might not have been regarded as a material omission.   But because there was such a provision in the EPA, the omission of any mention of the six identified contracts was material.   That is particularly true in light of the fact that each of the six contracts at issue imposed obligations on NIS that would extend after the sale and would apply even if the company did little or no business.

I find that even for a company with annual sales in the range of $80 million, the presence of contingent liabilities ranging from $250,000 to more than $4 million would be material.  The failure to disclose those contracts therefore constituted a breach of the EPA by the defendants.

With that said, it is important to distinguish among the six contracts in assessing whether their non-disclosure caused injury to the plaintiffs.  And on this issue, the various contracts stand differently.

Sioux Creek Silica.  The evidence at trial showed that at the meeting between Mr. Hajas, Mr. Dore, Mr. Swanson, and Brian Gilbertson on July 9, 2018, Mr. Hajas and Mr. Dore were told about the Sioux Creek Silica contract, including that it contained a commitment for NIS to purchase 500,000 tons of sand from Sioux Creek through June 9, 2019.[19]  Tr. 1019:21–1034:11; DX188.  Because Mr. Hajas and Mr. Dore were aware of the Sioux Creek Silica contract and the purchase commitment in that contract, I find that the plaintiffs were not prejudiced by the omission of reference to the Sioux Creek Silica contract in Schedule 2.15 of the EPA, even though the failure to include that contract in Schedule 2.15 constituted a breach of the contract.  The plaintiffs are therefore not entitled to any remedy based on the non-disclosure of the Sioux Creek agreement.

Chetek Express.  The evidence shows that Mr. Hajas and Mr. Dore were aware that Chetek Express was providing trucking services between the NIS facilities in Wisconsin, but it does not show that they were aware of the provision of the contract with Chetek Express that contained a

---

[19]  Mr. Dore's notes, at DX188, use the term "Varde," which refers to a private equity group that was affiliated with the Sioux Creek Silica mine.  Tr. 1013:3–6.  Although the plaintiffs suggest that a discussion that took place two months prior to due diligence should not be relevant to their contract claim, the evidence showed that Mr. Dore was aware of and interested in NIS's relationship with Varde.  Indeed, Mr. Dore testified that he introduced Mr. Gilbertson to the Varde investors, Tr. 1010:23–25, and he initiated the conversation at the July 9 meeting by asking: "Are you still talking to, from a working perspective, the Varde folks with their wet plant and co-marketing and those kinds of things?"  Tr. 1024:9–12.

minimum hauling commitment that could result in penalties totaling as much as $4,140,000 if Chetek Express were not used to transport sand over the remaining life of its contract with NIS. Moreover, the evidence showed that such commitments were not common in contracts for trucking services with companies such as Chetek Express, so there was no reason for Mr. Hajas or Mr. Dore to expect that NIS had such an arrangement with Chetek Express.

The defendants argue that Chetek Express had never exercised its minimum charge rights, from which they suggest that there was no significant risk that the minimum charge provision of the contract would be enforced. There is no evidence to support that view, however. In the event of a failure to use Chetek Express trucking services for the minimum required amount of hauling, Chetek Express had legal grounds for enforcing that provision of the contract. The fact that it had never done so in the past may simply indicate that during the relationship between the parties there was no extended period in which trucking services were not needed. Past experience was no guarantee that trucking services would not be needed in the event of a down market in the oil business or in the demand for frac sand.

The defendants also point out that after taking control of NIS, the plaintiffs renegotiated the agreement with Chetek Express and arranged to have the mandatory minimum requirement removed from the contract. But at the time of the sale, there was no guarantee that such an arrangement could be reached, or for what price.[20] I therefore find that the failure to disclose the

---

[20]   Mr. Gilbertson testified about the circumstances that led to the renegotiation of the Chetek Express contract. He explained that after this lawsuit was brought, he spoke with his cousin, Chris Johnson, who ran Chetek Express, and explained that Mr. Hajas had identified the minimums in the Chetek Express contract as one of the grounds for the lawsuit. Tr. 678:7–679-3. Mr. Gilbertson then advised Mr. Johnson to remove the minimums, and Mr. Johnson agreed. *Id.*; *see also* Tr. 483:13–484:2. Although that agreement may have eliminated the problem going forward, it was not clear at the time of the equity purchase that Chetek Express would agree to remove the minimums set forth in the contract. That contract therefore imposed potential obligations on NIS that were not disclosed prior to the purchase. Moreover, Mr. Hajas testified

36

Chetek Express contract constituted a breach of the EPA that entitles the plaintiffs to some form of relief.

RJR Trucking.  The RJR Trucking contract for transload services bound NIS to a monthly minimum fee of $60,000 for ten months.  NIS's exposure, in the event it did not meet the monthly minimum amount of transloading services, was therefore up to $600,000, not a negligible amount. Although the plaintiffs were aware of a contract with RJR that was to expire on October 31, 2018, the evidence does not show that they were aware that in September 2018, NIS entered into a new contract with RJR in which NIS agreed to pay a monthly minimum fee of $60,000 to RJR for a 12-month term.

The defendants argue that the RJR contract was beneficial to NIS and necessary to transload sand in order to fulfill the company's contract to sell sand to Marathon.  The defendants point out that there was no evidence that the RJR contract was not competitively priced, and they contend that the RJR contract was entirely set off by the Marathon supply contract, which committed Marathon to purchase 100,000 tons of sand annually from NIS, for which RJR would provide the transload services.

The defendants' "set-off" argument amounts to a contention that the RJR contract could not cause loss to NIS because Marathon was committed to purchase more sand from NIS than the minimum transload amount promised to RJR.  The problem with that argument, however, is that under its contract, Marathon was free to require the sand to be delivered to at least one location where RJR did not operate.  *Compare* PX100 at ¶ 2 (Marathon contract identifying possible

that as a condition of Chetek Express's agreeing to remove the mandatory minimums in the contract, NIS had to agree that Chetek Express would receive more than half of NIS's business. Tr. 480:21–483:3.  That concession clearly indicates that the parties attached value to the mandatory minimum haulage provision of Chetek Express's contract.

transload locations as Pocasset, OK; El Reno, OK; or Kingfisher, OK), *with* PX006 at ¶ 1 (RJR contract identifying transload facilities at Pocasset, OK, and El Reno, OK).   Thus, the two contracts were not strictly set-offs.   Moreover, the set-off arrangement would be effective only if Marathon abided by its contractual obligation to purchase 100,000 tons of sand annually and NIS were able to supply that amount of sand to Marathon.   If either of those contingencies failed, the RJR contract could become a liability for NIS.   Thus, the failure to list the RJR contract in Schedule 2.15 constituted a breach of the EPA.   The risk associated with the RJR contract would appear to be smaller than the risk associated with some of the other undisclosed contracts, but the defendants— taking an all-or-nothing approach—did not offer evidence regarding how much less risk that contract entailed.   The plaintiffs are therefore entitled to relief based on the breach of the EPA attributable to the failure to disclose the RJR contract.

CIG.   The CIG contract for transload services in Jal, New Mexico, required CIG to provide transload services for $6 per ton, and it contained a minimum commitment of 20,000 tons per month for the remaining six months on the contract.   The defendants argue that the contractual rate for transload services was competitive and that the contract benefited the company by ensuring that transload services would be available at one of the company's busiest delivery points. Nonetheless, the contract committed NIS to paying a minimum of $120,000 per month for six months even if CIG transloaded no sand for NIS during that period.[21]   For that reason, the breach created an undisclosed risk for NIS for which the plaintiffs are entitled to a remedy.

_____

[21]   During his testimony, Mr. Gilbertson noted that, after the equity purchase, NIS extended the contract with CIG, which Mr. Gilbertson suggested was an indication that the plaintiffs regarded that contract as favorable. Tr. 537:5–538:1, 667:23–668:7. Mr. Hajas, however, testified that the CIG contract was extended with a modification that allowed NIS to meet the mandatory minimums over a longer period of time. *See* Tr. 406:22–411:7. Mr. Hajas explained that the company knew it would not be shipping any more sand to Jal, New Mexico, where CIG was located, during the initial term of the contract. *See id.* The company therefore negotiated the

_Mascoutin Heights and SMBC Rail Services_.  The two railcar leases committed NIS to lease terms of 16 months (for Mascoutin Heights) and six months (for SMBC).  The defendants were aware of the fact that NIS leased railcars from SMBC and Mascoutin Heights, but the evidence does not show that the defendants were aware of the lengths of the two lease terms or the existence of any continuing obligation with respect to the railcar leases.  The Mascoutin Heights contract obligated NIS to pay approximately $540,000 over a 16-month period, and the SMBC contract committed NIS to pay approximately $267,000 over a six-month period.  Those amounts would have been due regardless of whether NIS produced or sold any sand during the lease term and regardless of whether the railcars were actually used.  For that reason, the defendants' failure to disclose those contracts entitles the plaintiffs to some relief.

To be sure, there is force to the defendants' argument that the plaintiffs knew NIS leased some of the rail cars that it used and therefore the plaintiffs would naturally understand that the leases would continue for at least some period of time.  Nonetheless, the length of the leases and the financial commitment associated with those leases constituted a potential burden for NIS going forward, the nature and dimension of which should have been disclosed to the plaintiffs pursuant to the EPA.

At various points at trial and in their Proposed Findings of Fact and Conclusions of Law, the defendants have suggested that Mr. Gilbertson acted in reliance on outside counsel in deciding that the six contracts now in dispute did not need to be disclosed in Schedule 2.15 of the EPA.

---

extension of the contract in the hope that during the extended period it would be able to ship enough sand to meet the minimum requirements of the contract for the entire contractual period. _See id._ It did not work out that way, and the company ended up losing more money on the CIG contract than it would have lost under the original contract. _See id._  I find Mr. Hajas's explanation for the extension credible, and therefore I do not agree that the post-purchase decision to extend the contract indicates that the initial contract did not impose an undisclosed contingent liability on NIS.

That argument fails. Although lawyers from the Faegre Baker Daniels law firm, which represented NIS, were involved in preparing the EPA, the evidence does not show that they compiled what purported to be a complete list of material contracts or signed off on the list that NIS prepared for the EPA. To the contrary, the evidence shows that the attorneys directed Mr. Gilbertson to complete the list of material contracts, and he undertook to do so. *See* DX110.019; Tr. 709:3–10, 717:20–718:7. Mr. Gilbertson's failure to include those contracts is not chargeable to the attorneys, as nothing in the attorneys' conduct can be viewed as having in any way suggested that the six contracts here at issue were not material or did not need to be disclosed in Schedule 2.15 of the EPA.

### 3. Other Claims of Misrepresentation or Nondisclosure

The plaintiffs raise three additional points in support of their claim that the defendants misrepresented NIS's financial condition.

First, the plaintiffs complain that the discretionary bonus payments made by NIS in 2018 should have been accrued on the company's financial statements, but were not. The parties agree that accrual of bonuses is required only if the bonuses are expected. The evidence shows that NIS was not obligated to pay bonuses and that there was substantial uncertainty about whether and when bonus payments would be paid, and in what amounts. Tr. 690:2–20. The evidence also shows that the plaintiffs were aware that NIS only sometimes paid bonuses to its employees. DX082; Tr. 431:2–435:9. In light of those facts, it was not unreasonable for the company not to accrue the bonus payments on its financial statements. The failure to do so therefore did not constitute a breach of the EPA. Moreover, in light of the plaintiffs' awareness that the company sometimes paid bonuses, but that bonuses were neither guaranteed nor invariably awarded, any

failure to accrue the bonuses on the company's books did not affect the price the plaintiffs paid for the equity they purchased.

Second, the plaintiffs argue that NIS booked two large accounts receivable at full value rather than discounting them.  Those accounts receivable were reported without discount in the company's 2017 audit and the June 30, 2018, aging accounts receivable report, both of which the plaintiffs saw before the sale closed.  Therefore, even though the plaintiffs contend that those receivables should not have been carried on NIS's books at full value, the plaintiffs were aware of the receivables throughout the transaction, and if they regarded the receivables as overvalued, they were in a position to make their own assessment of the effect of those accounts on the company's value; there was no failure of disclosure with respect to the accounts.  As to one of the accounts receivable, the "Transload Sand Sales" or "Jim Berry" receivable, the plaintiffs were made aware of that account receivable during due diligence but did not discuss that account with Mr. Gilbertson. Tr. 688:16–25, 1499:12–1500:7.  As to the second account receivable, the "EcoStim" receivable, the plaintiffs were also aware of that account during due diligence.  Tr. 1499:12–1500:7.  Moreover, Mr. Gilbertson testified that because the EcoStim receivable was lienable, he was not concerned that the company would be unable to recover the amount due.  Tr. 689:18–21. That conclusion was not shown to be unreasonable.  The treatment of the accounts receivable on the company's books therefore does not constitute a breach of the EPA.

Third, the plaintiffs complain that during due diligence, the defendants represented that there was a $1,304,012.42 receivable held in escrow pending the resolution of a lawsuit, and that NIS expected to receive the funds.  *See* Tr. 583:12–587:9.  The plaintiffs state that the lawsuit was not resolved and that they incurred additional legal fees in connection with the matter.  However, Mr. Hajas assigned no value to that receivable in his valuation of the company.  Tr. 304:21–305:3,

310:11–312:4, 589:14–22.  Nothing about that transaction constituted a material non-disclosure or misrepresentation to the plaintiffs for purposes of the EPA.

The plaintiffs' complaints about the three accounts receivable all have this in common: each of the accounts receivable was disclosed to the plaintiffs; none of the three were discounted on NIS's books; there was some expectation on the part of NIS management that those receivables could be collected, either directly or through a lien; and other than the fact that the company's books carried those receivables at full value, the plaintiffs do not assert that there were any misrepresentations as to the status of those receivables.  Under those circumstances, I find that NIS's treatment of the three receivables at issue did not constitute a breach of the defendants' obligations under the EPA.

The net effect of the claim regarding the six undisclosed contracts, the unaccrued bonuses, and the accounts receivable is this:  The essential features of one of the contracts (Sioux Creek Silica) were disclosed to the plaintiffs in advance of the sale and therefore the failure to list that contract on Schedule 2.15 warrants no relief.  Critical features of the other five contracts (Chetek Express, RJR, CIG, Mascoutin Heights, and SMBC) were not disclosed.  The failure to disclose those contracts constitutes a breach of the EPA, and the breach with respect to those contracts warrants recovery.  The plaintiffs' complaints about the alleged nondisclosure of bonuses and the valuation of accounts receivable were not actionable breaches of the EPA.

Because I have found that the defendants breached their obligations set forth in the EPA in some respects, the plaintiffs are entitled to monetary relief, although considerably less sweeping relief than they sought in their complaint, as discussed in Part C, below.

### B.  The Fraud Claims

In addition to their breach of contract claim, the plaintiffs have raised federal securities fraud and common law fraud claims against the defendants.

To establish securities fraud, the plaintiffs must prove that the defendants (1) made a misstatement or an omission of a material fact; (2) with scienter; (3) in connection with the purchase or the sale of a security; (4) upon which the plaintiffs reasonably relied; and (5) that the plaintiffs' reliance was the proximate cause of their injury.  *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178 (3d Cir. 2003).

To establish common law fraud under Delaware law, the plaintiffs must prove (1) that the defendants falsely represented or omitted facts that the defendants had a duty to disclose; (2) that the defendants knew or believed the representation was false or made the representation with a reckless indifference to the truth; (3) that the defendants intended to induce the plaintiffs to act or refrain from acting; (4) that the plaintiffs acted in justifiable reliance on the representation; and (5) that the plaintiffs were injured by their reliance.  *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

Both causes of action require scienter on the part of the defendants.  That is, the plaintiffs must prove that the defendants knew that statements they made were false or misleading, or that the defendants acted recklessly with respect to the truth of those statements.  *See id.*; *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 n.3 (2007) ("Every Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement [on a federal securities fraud claim] by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required.").  Although I have found that the defendants breached the EPA by failing to disclose several material contracts, which could constitute a

43

material omission for purposes of their fraud claims, I find that neither Mr. Gilbertson nor the defendant entities (through their agent or agents) intentionally made false statements or acted recklessly with respect to the truth of their statements.

There is substantial evidence in this case suggesting that Mr. Gilbertson (and, by extension, the other defendants) intended to be as transparent as possible with Mr. Hajas and Mr. Dore regarding the transaction.  First, when receiving the August 2018 financial statements from Carlson Advisors, Mr. Gilbertson sought to confirm that the statements were "solid" before forwarding them to the plaintiffs, because he wanted to "make sure everything was . . . 100 percent accurate, beyond question."  DX088; Tr. 649:14–19.  Second, Mr. Gilbertson's request to add an attorney's fees provision to the EPA, particularly in view of the plaintiffs failure to request one during the negotiations, is evidence that he did not act with fraudulent intent in negotiating the transaction. *See* Tr. 624:1–625:24.  Third, Mr. Hajas and Mr. Dore both testified that they were never denied access to any specific information that they requested from Mr. Gilbertson or others at NIS.  Tr. 294:11–295:19 (Hajas); Tr. 974:23–975:5.  And more generally, I found Mr. Gilbertson to be a credible witness, and I give considerable weight to his representations that he wanted to give a complete and accurate disclosure of the company's status to the plaintiffs prior to the closing of the transaction. *See, e.g.*, Tr. 587:8–588:1.

The only evidence in the record that might suggest recklessness or an intent to deceive on the part of anyone associated with NIS is the incident involving Brian Gilbertson's "napkin math." In that incident, which occurred on October 10, only days before the sale closed, Brian Gilbertson received an inventory reconciliation worksheet from Ms. Christenson that may have been inconsistent with the $13 million inventory figure that appeared in the August 2018 financials.  He then did a quick calculation, which he shared with the plaintiffs and which appeared to confirm

the inventory figure on the August 2018 financial statements.  *See* PX144; PX144-1; PX145.  That evidence is insufficient to establish scienter, however, for several reasons.  First, as discussed above, it is not clear that Brian Gilbertson's characterization of the components of the inventory calculation was inaccurate.  Second, there is no indication that his "napkin math" was the product of deceptive intent.  And third, it does not appear that Ryan Gilbertson was in any way involved in that alleged misrepresentation.  Ryan Gilbertson was not included on the email from Ms. Christenson to Brian Gilbertson, nor was he included on Brian Gilbertson's email to Mr. Dore regarding his "napkin math."  *See* PX144; PX145.  Particularly because there is no evidence in the record that Brian Gilbertson was authorized to speak on behalf of any defendant (as opposed to NIS itself), I do not find that his statements regarding inventory contribute anything of substance to the plaintiffs' effort to establish scienter on the part of the defendants.

Because the plaintiffs have not established that the defendants acted with scienter in making any alleged misrepresentations or omissions, I reject the plaintiffs' allegations of securities fraud and common law fraud.  Accordingly, I find for the defendants as to those two claims.

## C. Remedy

Having found that the defendants breached the EPA, I now turn to the question of what remedy should be awarded to the plaintiffs on their breach of contract claim.  The plaintiffs request that the court award damages in the amount of $11,115,247.72, the full purchase price paid by the plaintiffs for the defendants' equity interests in NIS.  The plaintiffs argue that but for the misrepresentations made by the defendants, Mr. Hajas would not have entered into the transaction at all and therefore they are entitled to recover the full amount paid on the contract.  In the alternative, the plaintiffs argue that they are entitled to recover the difference between the purchase price and the value of the defendants' equity interests had the material contracts been disclosed.

The ordinary remedy for breach of contract is expectation damages, which seek "to put the injured party in as good a position as if the contract was fully performed." 12 Timothy Murray, Corbin on Contracts § 61.5 (Matthew Bender ed. 2022). A different remedy, referred to as "restitution" or "rescission," seeks to "restore the status quo ante and thus . . . put the injured party in as good a position as that occupied by that party before the contract was made." *Id.*; *see also* Restatement (Third) of Restitution & Unjust Enrichment § 37 cmt. a (2011). During closing arguments, the plaintiffs informed the court that they are seeking rescission with respect to only their fraud claims and not their breach of contract claim. *See* Dkt. No. 274 at 143:16–144:20. In other words, they concede that they are not seeking a damages award for the full purchase price with respect to their contract claim. Accordingly, expectation damages, i.e., an award of damages that "put[s] the injured party in as good a position as if the contract was fully performed," is the appropriate measure of damages in this case, because I have found for the plaintiffs on only their breach of contract claim. *See* Corbin on Contracts § 61.5.

In establishing the amount of expectation damages they should be awarded, the plaintiffs rely on the opinion of their expert, Dr. Timothy Nantell, who testified regarding the price the parties would have agreed to had there been full disclosure and compliance with the warranties in the EPA. Dr. Nantell testified regarding three different damages models that applied various discounts to the liabilities associated with the six contracts that were not disclosed on Schedule 2.15. He testified that applying a 20 percent discount to each of those liabilities, which was reflected in his "Damages II" model, was an appropriate "low end" for the damages analysis.[22] *See* Tr. 1587:14–1593:6. In light of the defendants' failure to offer any competing model for

---

[22] The plaintiffs also rely on the 20% discount in explaining the impact that each contract would have individually on the damages analysis. *See* Dkt. No. 269 at 57–58.

measuring damages, I find that using a 20% discount is a reasonable approach, and therefore the discussion in this section will refer exclusively to Dr. Nantell's "Damages II" model.

Starting from the assumption that the plaintiffs were entitled to prevail in all respects on their breach of contract and fraud claims, Dr. Nantell testified that the parties would have agreed to a purchase price of $3,497,610, and that the plaintiffs would therefore be entitled to the difference between that purchase price and the actual contract price of the EPA, or $7,617,637.

Dr. Nantell's analysis employs the same "EBITDA multiple" valuation method used by Mr. Gilbertson and Mr. Hajas in their valuation spreadsheets. Generally speaking, Dr. Nantell sought to modify the inputs to that valuation model to reflect a full and proper disclosure by the defendants. For example, he modified the inventory input in the EBITDA multiple valuation model to reflect Mr. Dore's "derived inventory" value, and he increased the liabilities on the balance sheet to account for the continuing liabilities presented by the six undisclosed contracts. The defendants challenge various aspects of Dr. Nantell's methodology, but given their failure to offer a competing theory of damages, I accept Dr. Nantell's general approach for purposes of calculating a damages award in this case.

Dr. Nantell's damages model assumes that the plaintiffs have prevailed on all aspects of their liability case. But they have not prevailed on several important issues going to liability. At the end of the day, the only claim on which the plaintiffs are entitled to relief is their breach of contract claim, and they may recover on that claim only to the extent they were injured by the nondisclosure of the Chetek Express, RJR, CIG, Mascoutin Heights, and SMBC contracts. Accordingly, Dr. Nantell's adjustments for inventory, accounts receivable, employee bonuses, and the Sioux Creek Silica contract will not be considered in determining the proper award of damages in this case.

Following the bench trial in this case, I asked the parties to include in their proposed findings of fact and conclusions of law a breakdown of how each of the six undisclosed contracts contributes to Dr. Nantell's overall damages opinion.  The plaintiffs provided a table that outlined how the liability for each undisclosed contract would impact the value of the class B shares.  Dkt. No. 269 at 58.  That table assumed that the plaintiffs proved that the inventory was overstated, as they allege.  *See id.* at 57–58.  If that were the case, the value of the class A shares would have been $0, and any damages resulting from the undisclosed contracts would have been seen solely with respect to the class B shares.  *See id.*  However, I have not found that the inventory was overstated, and therefore the class A shares cannot be valued at $0.  In the letter briefs filed by the parties following the closing arguments in this case, it became clear that, if the inventory had not been overstated, the impact of the undisclosed contracts would have been felt by the class A shares only.[23]  *See* Dkt. No. 272 at 8; Dkt. No. 273 at 6–7.  Accordingly, I have adapted the plaintiffs' table by modifying the numbers to reflect the impact on the class A shares rather than the class B shares.  I have also removed the Sioux Creek contract from the plaintiffs' table because the non-disclosure of that contract did not result in damage to the plaintiffs.  That table, as modified,[24] is set forth below:

---

[23]  Dr. Nantell testified that the purchase price paid by the plaintiffs reflected an enterprise value for NIS of $66 million.  The combined potential liability of the five contracts for which the plaintiffs are entitled to recover (assuming a 20% discount, as Dr. Nantell does) is approximately $1.25 million.  As reflected in the opinion of Seth Fliegler, the plaintiffs' other expert who testified at trial, a decrease in enterprise value from $66 million to $64.75 million would have no impact on the value of the class B shares.  PX811.003.  Accordingly, the only effect of the undisclosed contracts would be on the value of the class A shares.

[24]  In accounting for the liabilities presented by the SMBC and Mascoutin Heights railcar lease contracts, Dr. Nantell included an estimated $2,500 return expense per railcar.  *See* Dkt. No. 269 at 57.  There was conflicting testimony at trial with respect to whether NIS would incur a cost to return the railcars at the end of each lease.  Mr. Gilbertson testified that when a railcar is shipped, the cost is paid roundtrip, and the only time a return cost is incurred is in the rare event that the return trip is longer than the outbound trip (which was typically from Wisconsin to Oklahoma,

| Contract | Potential Liability ("PL") | Effect on Class A (PL * 74.2% * 24.4%) | Indirect Effect on Class B (PL * 7.7%) | Direct Effect on Class B (PL * 66.9%) | Total Effect on Purchase Price |
|---|---|---|---|---|---|
| Chetek Express | $828,000 | $149,908 | $0 | $0 | $149,908 |
| Mascoutin Heights | $108,560 | $19,655 | $0 | $0 | $19,655 |
| CIG | $144,000 | $26,071 | $0 | $0 | $26,071 |
| RJR | $120,000 | $21,726 | $0 | $0 | $21,726 |
| SMBC | $53,460 | $9,679 | $0 | $0 | $9,679 |

Dkt. No. 269 at 57–58.  In the table above, the "potential liability" refers to the total exposure that each contract created for NIS multiplied by a 20% discount.  As Dr. Nantell testified, the 20% discount accounts for the risk associated with each of the six contracts.  Tr. 1587:14–1588:2.  Put differently, the 20% discount accounts for the fact that at the time of the transaction it was possible, but not certain, that NIS would have been forced to pay the shortfall costs associated with those contracts.

Considered in total, the five contracts that resulted in injury to the plaintiffs (Chetek Express, Mascoutin Heights, CIG, RJR, and SMBC) had a combined effect of $227,039 on the purchase price.[25]  That is, assuming that the price paid by the plaintiffs for the purchased equity

---

Texas, or New Mexico).  Tr. 726:6–729:3.  Mr. Hajas and Mr. Dore testified that there could be situations in which NIS would have to pay to return a railcar, but Mr. Dore also testified that he was unaware of any such scenario ever occurring in NIS's case.  Tr. 48:2–49:18 (Hajas); Tr. 1466:25–1470:14 (Dore).  Ultimately, I find Mr. Gilbertson's testimony to be more persuasive, and I therefore conclude that the cost to return a railcar should not be included in the potential liabilities associated with the SMBC and Mascoutin Heights contracts.  Accordingly, I have further modified Dr. Nantell's analysis below to disregard the estimated railcar return costs.

[25]  Applying a similar analysis, the defendants argue in their post-closing-argument letter brief that the damages award should be $224,019.  Dkt. No. 273 at 7.  The reason for the discrepancy between that number and the damages award is that the defendants deducted $2,500 in return costs for 254 rail cars, when in fact only 214 total rail cars were leased under the Mascoutin and SMBC contracts.  Id.; PX009; PX010.  The source of that error appears to be the plaintiffs' table in Dkt. No. 269, at 57, in which the plaintiffs appear to have made a typographical

was a fair market price, the purchased equity would have sold for $227,039 less had the defendants disclosed those five material contracts.  Accordingly, the plaintiffs are entitled to that amount in expectation damages.

The defendants argue that the plaintiffs are not entitled to damages associated with the class B units because the plaintiffs could have redeemed the class B units at the end of 2018 and received the full value of those shares at that time.  By way of background, the class B units of NI Sand Holdings were subject to redemption by January 1, 2019; that is, the company could have forced the owners of the class B shares to sell those shares back to the company at a specified price on that date.  R. Gilbertson Impeachment Exhs. at 113.  As part of the EPA, the plaintiffs purchased $4,840,237.72 worth of class B units, PX001 at § 1.1(c)–(g), and the total value to be paid to all the class B shareholders in the event of a redemption was $7.2 million, Tr. 1523:7–14.  If it chose to redeem the shares, NIS would have had to pay the investors for their shares at that time.

At the end of 2018, however, NIS had only $63,712 in cash and cash equivalents on hand. PX016.  Accordingly, NIS did not have nearly enough available funds to redeem the class B units at that time, regardless of whether the entirety of the class B shares or only the plaintiffs' class B shares were redeemed.  Mr. Hajas thus made the decision not to redeem the class B shares at the end of 2018.  Tr. 379:1–7.  I find that Mr. Hajas's decision not to redeem the class B shares was reasonable, and thus there was no failure by the plaintiffs to mitigate damages with respect to the class B shares.  *See VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 300–01 (3d Cir. 2014) (noting that the determination of whether a plaintiff failed to mitigate "considers whether mitigation was feasible, what measures to limit damages were reasonable under the circumstances,

---

error.  The plaintiffs' calculations accurately reflect the costs to return 214 rail cars despite listing 254 rail cars in their table.  *See* Dkt. No. 269 at 57–58.

and whether the plaintiff took sufficient measures to mitigate").  But even if the plaintiffs could have redeemed the class B shares, their failure to do so would have had no effect on the damages award in this case because, as noted above, there are no damages that are attributable to the class B shares.

The plaintiffs also argue that they are entitled to punitive damages.  Punitive damages are not recoverable on a breach of contract claim "unless the conduct also amounts independently to a tort."  *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445 (Del. 1996) (citing Restatement (Second) of Contracts § 355).  Because the plaintiffs have prevailed on only their breach of contract claim, and not their fraud claims, the defendants have not committed a tort that would entitle the plaintiffs to punitive damages.  In any event, under Delaware law a defendant's conduct must be "particularly egregious and rise[] to the level of willful, wanton or malicious conduct" or be "outrageous or particularly reprehensible" in order to justify an award of punitive damages.  *Devaney v. Nationwide Mut. Ins. Co.*, 679 A.2d 71, 77 (Del. 1996).  As noted, the defendants did not act with scienter in making the misrepresentations that the plaintiffs allege, and their failure to list five material contracts on Schedule 2.15 of the EPA is not the sort of outrageous conduct that would justify an award of punitive damages.  Accordingly, the plaintiffs' recovery will be limited to expectation damages.

Finally, the plaintiffs argue that the defendants are jointly and severally liable for the damages award in this case.  Under Delaware law, "[a]n obligation or written contract of several persons shall be joint and several, unless otherwise expressed."  6 Del. C. § 2701.  The face of the EPA does not appear to indicate an intent by the parties to alter that default rule, *see* PX001, and the defendants have not offered any reason to believe that they should not be jointly and severally

liable for the damages award.  Accordingly, I find that the defendants are jointly and severally liable for the $227,039 due to the plaintiffs.

## CONCLUSION

In summary, I find that the defendants breached the EPA by failing to disclose five material contracts (Chetek Express, Mascoutin Heights, CIG, RJR, and SMBC) on Schedule 2.15 of the EPA.  The plaintiffs have not established that the defendants breached the EPA by providing inaccurate financial statements with respect to NIS's inventory as of August 31 and September 30, 2018, by failing to disclose the Sioux Creek Silica contract, or by failing to properly account for employee bonuses and certain accounts receivable.  The plaintiffs have also failed to establish that the defendants acted with scienter for purposes of their common law fraud and securities fraud claims.

More generally, while I find that the defendants breached the EPA in certain respects and that the plaintiffs are entitled to recover damages commensurate with the scope of the breach, I find that the plaintiffs' evidence does not support their general theory of this case—that the loss of their entire investment in NIS was attributable to fraud and wholesale contract breaches by the defendants.  The losses suffered by the plaintiffs on their investment were largely attributable to the collapse of the market for northern white frac sand, a circumstance unanticipated by any of the parties and certainly not caused by the defendants.

As a result of the defendants' failure to disclose five material contracts to the plaintiffs, the plaintiffs are entitled to recover $227,039 from the defendants.  Within seven days of the issuance of this order, the parties should docket a proposed form of judgment that includes an allocation of the recovery between APEX and Gopher.  If the parties cannot agree regarding any aspect of the

form of judgment, they should each submit a proposed form of judgment and a brief explaining their position as to how the judgment should be framed.

In accordance with Federal Rule of Civil Procedure 54(d) and Local Rule 54.1, the parties may move for costs and attorney's fees within 14 days of the entry of judgment.  Any motion for costs or fees should include a discussion of whether and to what extent the moving party is the prevailing party, and how the court should proceed if it concludes that both parties prevailed in part or that there is no prevailing party.  Any brief in support of a motion for costs and/or fees will be limited to 20 pages in length.  As part of the judgment, the court will enter an order pursuant to Rule 58(e) of the Federal Rules of Civil Procedure providing that if either or both sides make a timely motion for attorney's fees under Rule 54(d)(2), the motion or motions will have the same effect under Federal Rule of Appellate Procedure 4(a)(4) as a timely motion under Rule 59; that is, that the time to file an appeal will run for all parties from the entry of the order disposing of the last of such motions.  *See Heck v. Triche*, 775 F.3d 265, 273–75 (5th Cir. 2014).

IT IS SO ORDERED.

SIGNED this 18th day of August, 2022.


_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE